[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-11251

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

KENNETH INGRAM,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 3:19-cr-00113-MCR-2

_____

Before JILL PRYOR, KIDD, and WILSON, Circuit Judges.

PER CURIAM:

A jury found Kenneth Ingram guilty of committing two controlled substance offenses. The district judge sentenced him to 70 months of imprisonment. He now appeals, challenging the judge's denial of his request to file an out-of-time suppression motion as well as the calculation of his sentencing guideline range. After careful review, we affirm.

## I. BACKGROUND

In January 2019, the Walton County Sheriff's Office, with the assistance of the Drug Enforcement Administration ("DEA"), began investigating a drug trafficking network in Walton County, Florida, that involved Ingram; Ingram's son, Kadeem Ingram ("Kadeem"); and Terrell Burdette. Intercepted communications and surveillance revealed that Kadeem worked with Ingram to obtain, store, and provide cocaine and cocaine base to Burdette for further distribution. Ingram would rent cars for himself and Kadeem to use during drug sales and trips to Miami to obtain cocaine from their suppliers. In July 2019, officers stopped Kadeem and Ingram one evening as they were returning from a trip to Miami and searched their car. The officers found approximately 1,000 grams of cocaine, approximately $4,000, and 3 cellphones.

The next day, officers executed a search warrant at Ingram's residence. In one bedroom, officers found a spoon with a white powdery residue, a digital scale, a black backpack covered in white

residue containing multiple plastic bags, a zip-lock bag with caffeine inside, and several unloaded rifles and shotguns. In another bedroom, officers found a loaded handgun sitting on a dresser, a digital scale covered in white residue, a plastic bag containing suspected marijuana, unloaded shotguns, and legitimate prescription pills belonging to Ingram and his wife. Officers also seized a metal cocaine press and floor jack in another room of the house.

In September 2019, Ingram, Kadeem, Burdette, and two others were indicted in connection with this drug trafficking activity. Specifically, Ingram was charged with (1) knowingly and willfully conspiring to distribute and possessing with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii), (b)(1)(B)(iii) and 846 (Count One), and (2) possession with intent to distribute 500 grams or more of a mixture and substance containing cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii) and 18 U.S.C. § 2 (Count Nine). Ingram pleaded not guilty to both counts.

*A. Pretrial Matters and Ingram's First Trial*

On October 4, 2019, the district court issued a scheduling order setting a filing deadline for pretrial motions of 10 days after the date of the order and calendaring a joint trial for Ingram and Kadeem for the following month. Three days later, Alfreda Coward, Ingram's retained counsel, entered her appearance in the case. Due to several continuance motions and delays from the COVID-19 pandemic, the trial was continued to November 2020 and the filing deadline for pretrial motions was reset to September

30, 2020. On the deadline, Attorney Coward filed a motion to suppress evidence and statements obtained from Ingram as a result of the July 2019 traffic stop. Following an evidentiary hearing, the district judge denied the motion.

Ingram thereafter pleaded guilty to Counts One and Nine before a magistrate judge, and the district judge accepted his plea. As preparation began for sentencing, Attorney Coward withdrew, and the court appointed the Office of the Federal Public Defender to represent Ingram. Months after the court issued its order appointing Ingram new counsel, Thomas Cassidy, III, filed his notice of appearance. Ingram then moved, through Attorney Cassidy, to withdraw his guilty plea, but the court denied the motion.

The court originally set sentencing for October 2021, but that date was continued when Attorney Cassidy informed the court that he failed to provide Ingram with a copy of his presentence investigation report ("PSI") and did not otherwise review the PSI with his client. Due to this conduct, as well as concerns over Attorney Cassidy's lack of responsiveness, the court appointed Ingram new counsel. Later that month, Christopher Rabby filed his notice of appearance in Ingram's case.

In February 2022, Attorney Rabby filed a new motion to withdraw Ingram's guilty plea, arguing that another attorney who had been involved in Ingram's and Kadeem's "mutual defense team" engaged in fraud, sabotaged their criminal case, and encouraged them to plead guilty. The district court granted the motion on February 25, 2022, and cancelled sentencing.

The same day, the court entered an order scheduling a new trial for Ingram and Kadeem, and setting a deadline of 14 days from the date of the order for filing pretrial motions. The order also required motions in limine to be filed at least 14 days before trial. Following a telephone conference with the parties in March 2022, the court continued the trial date and modified its earlier scheduling order to "not permit any new motion to suppress evidence related to the vehicle stop," because: (1) "this case was filed in September 2019, and the deadline for pretrial motions ha[d] long past"; (2) both defendants had filed motions to suppress, which were fully litigated and denied on the merits; and (3) "discovery ha[d] been available to, and reviewed by, [d]efendants' attorneys over the past two years."

In April 2022, Attorney Rabby moved on Ingram's behalf to file an out-of-time motion to suppress evidence recovered from the July 2019 search of Ingram's house. Attorney Rabby stressed that he was Ingram's third lawyer and that he had determined that filing this motion was "appropriate and well founded" after a review of discovery and discussion of the case with Ingram. The proposed motion to suppress, which was attached to the filing, argued that the search of Ingram's house was unlawful because the affidavit supporting the search warrant did not sufficiently establish probable cause and the officers did not execute the warrant in good faith. The government responded in opposition, arguing that Ingram failed to show good cause to extend the pretrial motions deadline because the search warrant challenged in the motion was made

available to Ingram in November 2019, but his previous counsel chose not to contest it in the September 2020 suppression motion.

The district court denied the request to file the out-of-time motion to suppress. The court found that the deadline for pretrial motions was 10 days after the entry of its October 2019 order originally setting Ingram's and Kadeem's case for trial, but it had allowed Ingram to file one late motion to suppress in September 2020. The court concluded that, although Attorney Rabby was not appointed until October 2021, this fact did not constitute good cause for extending the filing deadline because it was undisputed that the residential search warrant challenged in the proposed motion to suppress had been available to Ingram for years.

Before trial, Ingram filed a motion in limine requesting to exclude the introduction of the guns recovered from his home as trial evidence. The court granted the motion as to the unloaded shotguns and rifles but denied the motion with respect to the handgun. Ingram and Kadeem then proceeded to trial in June 2022, but the court declared a mistrial after Ingram suffered a medical emergency on the third day of trial.

## B. Ingram's Second Trial

Ingram's and Kadeem's second trial was held in August 2022, at which time Attorney Rabby orally renewed his motion in limine, asking for the handgun also to be excluded from the trial evidence, and his request to file the out-of-time motion to suppress the evidence obtained from the search of Ingram's house. Relying on its previous reasoning, the district court denied these requests.

During trial, the government called several witnesses, including co-conspirator Burdette, who testified to the following relevant information. He explained that he had pleaded guilty to his charges and entered an agreement under which the government would move for a reduced sentence in exchange for his substantial and truthful cooperation in the case. Burdette also admitted to having abused drugs for much of his life and to having a "disgustingly embarrassing criminal history." In May 2018, Burdette was working with Kadeem, who obtained drugs from suppliers in Tampa and Miami and provided Burdette with cocaine and crack cocaine to sell to customers. Kadeem and Ingram rented cars in Ingram's name, and the two would travel together to south Florida to obtain cocaine. When they returned from their trips, Kadeem would store the drugs in his bedroom at Ingram's house.

Burdette further testified that Kadeem kept a cocaine press at Ingram's house and cooked crack cocaine at the house dozens of times, occasionally in Ingram's presence. Burdette stated that it was "common knowledge" that Ingram "always carried his firearm with him" on his trips to obtain drugs, although Burdette did not personally accompany Ingram or Kadeem on these trips. However, Burdette observed Ingram with the firearm when he went with Kadeem and Ingram on a trip to Texas to purchase a vehicle.

Following a three-day trial, the jury found Ingram guilty of Counts One and Nine.

*C. Ingram's Sentencing and Post-Judgment Motions*

Ingram's final PSI grouped together Counts One and Nine and provided a base offense level of 34, as Ingram was held accountable for at least 50 kilograms, but less than 150 kilograms, of cocaine. United States Sentencing Guidelines Manual § 2D1.1(c)(3) (Nov. 2021). The PSI also assessed a two-level enhancement for possession of a dangerous weapon due to the guns found in Ingram's home and Burdette's testimony that Ingram carried his gun on trips to obtain drugs, *id.* § 2D1.1(b)(1), as well as a two-level enhancement for maintaining premises for the manufacturing or distributing of controlled substances, *id.* § 2D1.1(b)(12), resulting in a total offense level of 38. The PSI calculated a criminal history category of I, as Ingram had only one adult criminal conviction, for violating a city ordinance, which did not receive any criminal history points. *Id.* § 4A1.2(c)(2). Based on these calculations, the PSI determined that Ingram's advisory guideline range was 235 to 293 months of imprisonment.

Ingram filed several objections to the PSI, including challenges to the imposition of the two-level firearm enhancement and the PSI's failure to apply safety-valve relief.

The district court held a joint sentencing for Ingram and Kadeem in March 2023. As relevant to this appeal, the court first found Ingram responsible for 25.5 kilograms of cocaine and recalculated his base offense level as 32. Turning to the guideline disputes, Ingram reiterated his objection to the firearm enhancement, noting that (1) he "had a concealed firearms permit," (2) the

handgun was found on his nightstand, which is "where a lot of people would maintain a firearm for self home protection," (3) there was no cocaine found during the search of his house, (4) officers did not recover a firearm during the earlier traffic stop, and (5) Burdette's testimony was the only evidence to support the enhancement.

The court overruled the objection, finding that the issue was a "close call" due to Ingram's concealed weapons permit and the fact that "he [c]ould have had the firearm for his personal protection, not necessarily to protect the drugs." However, the court concluded that it was not "clearly improbable" that the gun was connected to the offense given the amount of drugs stored and manufactured at Ingram's house, the amount of money involved in the operation, and Burdette's testimony that Ingram always had a firearm. Further, after Kadeem conceded that he was ineligible for safety-valve relief because he had not shown "an accounting of [his] activities to the government," Ingram conceded the same, stating that he "ha[d] not been able to present . . . evidence to the government to meet that necessary element of the safety valve."

After resolving the remaining guideline issues, including sustaining Ingram's objection to the two-level premises enhancement, the court calculated Ingram's total offense level at 34 and criminal history category at I, yielding a guideline range of 151 to 188 months. Ingram requested a downward departure or variance to "as close to [the five-year mandatory minimum sentence] as possible," based on his age, medical conditions, former employment as

a prison guard, and status as a first-time offender. Ingram then allocuted, emphasizing his poor health and innocence. He also stated that he kept the firearm near his bed for protection and took the gun with him on hunting trips, but never on trips to procure drugs.

The court departed downward "primarily [under] [U.S.S.G. §] 5H1.4," citing Ingram's serious medical conditions, and sentenced Ingram to 70 months of imprisonment on each count, to run concurrently, with 5 years of supervised release to follow. When the government asked the court whether the "sentence would have been the same regardless of the rulings on the guidelines," the district judge responded, "Yes . . . . [W]e spent a lot of time on the guidelines, I certainly took them into account, and I think they[] [a]re accurately calculated, but my decision is based under [18 U.S.C. §] 3553(a)."

Ingram appealed, and, while his appeal was pending with this Court, moved for compassionate release, 18 U.S.C. § 3582(c)(1)(A), and a sentence reduction based on Amendment 821 to the Sentencing Guidelines, *id.* § 3582(c)(2). We granted Ingram's motion to stay this appeal pending the resolution of his motions in the district court. The motions were denied in December 2024, and Ingram did not separately appeal them.

## II. STANDARD OF REVIEW

We review a district court's denial of a motion to suppress on grounds of timeliness for an abuse of discretion. *United States v. Andres*, 960 F.3d 1310, 1315 (11th Cir. 2020). We "review[] *de novo* the district court's interpretation of the guidelines and its

application of guidelines to the facts" but review the district court's findings of fact at sentencing for clear error. *United States v. Moran*, 778 F.3d 942, 959 (11th Cir. 2015). "We [also] review *de novo* questions of law dealing with the Guidelines." *United States v. Kapordelis*, 569 F.3d 1291, 1314 (11th Cir. 2009). However, where any constitutional or sentencing challenges are raised for the first time on appeal, we review only for plain error. *See United States v. Ramirez-Flores*, 743 F.3d 816, 821 (11th Cir. 2014); *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010).

## III. DISCUSSION

### A. Request To File Out-of-Time Suppression Motion

Ingram argues that the district court's denial of his request to file an out-of-time suppression motion challenging the search of his house was an abuse of discretion and violated his rights to due process and effective assistance of counsel. He asserts that it prevented him from benefitting from the issues that Attorney Rabby found important, and instead limited him "to what [his] previous attorneys . . . deemed appropriate and sufficient." He maintains that, if he had been allowed to pursue the suppression motion, it would have been meritorious, it would have resulted in the exclusion of prejudicial evidence from trial, and it would have made him eligible for a lower sentence. Ingram further argues that there was good cause to extend the pretrial motions filing deadline, emphasizing the impact of the COVID-19 pandemic, the short time Attorney Rabby had to become familiar with the case, the change in circumstances once he withdrew his guilty plea, and the fact that the

court ruled on his motion in limine without objection. We find Ingram's arguments unpersuasive.

Rule 12 of the Federal Rules of Criminal Procedure provides that certain pretrial motions, including motions to suppress evidence, must be filed before a court-set deadline. Fed. R. Crim. P. 12(b)(3)(C), (c). While a pretrial motion filed beyond a court-set deadline is untimely, a court may consider the untimely motion if the filing party "shows good cause." *Id.* R. 12(c)(3).

While the court's deadline for filing pretrial motions in Ingram's case expired in 2019, before Attorney Rabby was appointed, Ingram does not contest that he and his previous counsel had all the information necessary to challenge the residential search warrant when he filed his first (late) pretrial motion in September 2020. It was therefore not an abuse of discretion for the district court to find that Ingram had not shown good cause to extend the pretrial motions deadline once again to allow him to file another late motion in April 2022, when the case had been pending in the district court for almost three years. *See id.*; *United States v. Curbelo*, 726 F.3d 1260, 1267 (11th Cir. 2013) ("No good cause exists if the defendant had all the information necessary to bring a Rule 12(b) motion before the date set for pretrial motions, but failed to file it by that date." (quotation marks omitted)); *Andres*, 960 F.3d at 1316 ("Neither a strategic decision nor inadvertence constitutes good cause.").

Further, because Ingram never asserted in the district court that the denial of this request violated his constitutional rights, he must show plain error on appeal, and he has failed to do so. *See*

*Wright*, 607 F.3d at 715. "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it." *United States v. Morales*, 987 F.3d 966, 976 (11th Cir. 2021) (quoting *United States v. Lejarde-Rada*, 319 F.3d 1288, 1291 (11th Cir. 2003)). Ingram has not pointed to any decision from this Court or the Supreme Court holding that a district court's denial of a motion to suppress as untimely violates a defendant's rights to due process or effective assistance of counsel where the filing deadline preceded the appointment of a subsequent attorney. *Id.*

Accordingly, we cannot say that the district court abused its discretion, or otherwise erred, in denying Ingram's request to file an out-of-time motion to suppress the evidence recovered from the search of his home.

### B. U.S.S.G. § 4C1.1(a) Zero-Point Offender Adjustment

Ingram contends that he is entitled to a reduction to his sentence based on Amendment 821 to the Sentencing Guidelines, which added U.S.S.G. § 4C1.1(a). Under § 4C1.1(a)'s zero-point offender adjustment, a court must decrease a defendant's offense level by two levels if, as relevant here, the defendant does not have any criminal history points and "did not possess . . . a firearm or other dangerous weapon . . . in connection with the offense." U.S.S.G. § 4C1.1(a).

Because Ingram raises this argument for the first time on appeal, he must show plain error. *Ramirez-Flores*, 743 F.3d at 821.

However, he cannot show error, much less plain error, because, at the time of his March 2023 sentencing, Amendment 821 had not yet taken effect. *See* United States Sentencing Commission, *Adopted Amendments (Effective November 1, 2023)*, Amendment 821. Sentencing courts should normally apply the version of the guidelines in effect at the time of sentencing unless doing so would result in a harsher penalty, in which case the district court should apply the version of the guidelines in effect at the time of the offense. *United States v. Masferrer*, 514 F.3d 1158, 1163 (11th Cir. 2008); 18 U.S.C. § 3553(a)(4)(A)(i)–(ii). As such, the district court appropriately utilized the November 2021 Guidelines Manual to calculate Ingram's advisory guideline range and did not err in failing to consider the applicability of the not-yet-effective zero-point offender adjustment. *See Masferrer*, 514 F.3d at 1163.

Ingram maintains that his sentence should be reduced because he meets § 4C1.1(a)'s criteria, Amendment 821 applies retroactively, and "[h]is judgment is not final," as his case is currently on appeal. Although he is correct that this amendment applies retroactively as of February 2024, Ingram is incorrect about the finality of his judgment. *See* United States Sentencing Commission, *Adopted Amendments (Effective November 1, 2023)*, Amendment 825. Ingram's judgment became final for the purposes of this appeal when the district court sentenced him to a term of 70 months of imprisonment, and Ingram's subsequent filing of post-judgment motions in the district court did not affect the finality of the judgment. *See* 18 U.S.C. § 3582(b).

Ingram appropriately pursued Amendment 821 relief in the district court while this case was pending on appeal. *Id.* § 3582(c). The district court denied his motion. At that point, Ingram should have appealed the motion's denial if he wanted to raise his argument about the zero-point offender adjustment with our Court. Instead, he forfeited that opportunity and improperly chose to raise the issue in this direct appeal of his criminal judgment, which was rendered before § 4C1.1(a) became effective. We are therefore without authority to provide Ingram with the relief he requests in this appeal. *See United States v. Puentes*, 803 F.3d 597, 605–06 (11th Cir. 2015) (A "district court has no inherent authority to modify a sentence; it may do so only when authorized by a statute or rule.").

We thus conclude that the district court did not plainly err by failing to apply § 4C1.1(a)'s zero-point offender adjustment when calculating Ingram's advisory guideline range.

### C. U.S.S.G. § 2D1.1(b)(1) Firearm Enhancement

Ingram argues that the district court clearly erred in imposing the two-level § 2D1.1(b) enhancement based on the handgun found in his bedroom because the only evidence supporting the enhancement came from the unreliable testimony of Burdette, a convicted felon who testified for the government in exchange for a reduced sentence. He further emphasizes that he had a permit for the handgun and kept it for personal protection.

Section 2D1.1(b)(1) directs courts to apply a two-level increase to the offense level of a defendant for a crime involving the trafficking or possession of a controlled substance "[i]f a dangerous

weapon     (including     a     firearm)     was     possessed."
U.S.S.G. § 2D1.1(b)(1). "The government bears the initial burden
of showing, by a preponderance of the evidence, that a firearm was
'present' at the site of the charged conduct or that the defendant
possessed it during conduct associated with the offense of convic-
tion." *United States v. George*, 872 F.3d 1197, 1204 (11th Cir. 2017). If
the government makes this initial showing, the burden shifts to the
defendant to show that the connection between the weapon and
the offense was "clearly improbable." *Id.* (quotation marks omit-
ted).

Here, the government met its initial burden by establishing
the proximity between the loaded handgun and the drug parapher-
nalia found in Ingram's house. *Id.*; *see United States v. Carillo-Ayala*,
713 F.3d 82, 91 (11th Cir. 2013) ("[P]roximity between guns and
drugs, without more, is sufficient to meet the government's initial
burden. . . ."); *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir.
2006) (Where the offense of conviction is conspiracy, the
§ 2D1.1(b)(1) enhancement can apply "if the firearms are found in
a place where acts in furtherance of the conspiracy took place.").

While Ingram asserted that he used the handgun for per-
sonal protection rather than for any drug-related purposes, the dis-
trict court reasonably determined that this argument was insuffi-
cient to meet the burden of showing that the connection between
the loaded handgun and Ingram's offenses was "clearly improba-
ble," especially given Burdette's testimony to the contrary. *George,*
872 F.3d at 1204*; see also United States v. Cruickshank*, 837 F.3d 1182,

1192 (11th Cir. 2016) ("[A] district court's choice between two permissible views of the evidence . . . rarely constitutes clear error," so long as it is supported by the record and not influenced by a mistake of law (quotation marks omitted)). Although Ingram challenges Burdette's credibility on appeal, the district court's decision to credit Burdette's trial testimony, during which he candidly acknowledged his "embarrassing" criminal history and indicated that Kadeem stored substantial quantities of cocaine at Ingram's house and that Ingram always carried his gun, is a determination to which we give "substantial deference." *United States v. Plasencia*, 886 F.3d 1336, 1343 (11th Cir. 2018) (quotation marks omitted).

In any event, even if Ingram were correct that the district court clearly erred in calculating his guideline range, such an error was harmless, as it "did not affect the district court's selection of the sentence imposed." *Williams v. United States*, 503 U.S. 193, 203 (1992). To know whether an error "was truly harmless," we first must know whether "the district court would have reached the same result even if it had decided the guidelines issue the other way." *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006). We then must determine whether the ultimate sentence "would be reasonable even if the guidelines issue had been decided in [Ingram's] favor." *Id.*

Here, the district court explicitly stated that Ingram's 70-month sentence, which was below his guideline range, would have been the same regardless of the court's rulings on the guideline objections. *Id.* If the court had sustained Ingram's objection to

the firearm enhancement, his offense level would have been lowered by 2 levels to 32, resulting in a guideline range of 121 to 151 months. Ingram has the burden of showing that his 70-month sentence was unreasonable under this lower guideline range, and he has not made any argument on appeal regarding the substantive reasonableness of his sentence to sustain that burden. *Id.* at 1350.

There is also no support for such an argument, as the record reveals that the district court carefully considered the relevant 18 U.S.C. § 3553(a) factors and thoroughly explained its decision to depart downward from Ingram's calculated guideline range to account for the mitigating circumstances he presented, including his serious health concerns. *See United States v. Irey*, 612 F.3d 1160, 1189–90 (11th Cir. 2010) (en banc). Additionally, Ingram's 70-month sentence would still fall below the hypothetical lower guideline range, and it is significantly below the applicable statutory maximum of 40 years of imprisonment, which is further indicative of reasonableness. 21 U.S.C. § 841(b)(1)(B); *see United States v. Muho*, 978 F.3d 1212, 1227 (11th Cir. 2020) ("[S]entences that fall within the Guidelines range or that are below the statutory maximum are generally reasonable.").

Ingram also argues that the imposition of the firearm enhancement impacted his eligibility for safety-valve relief. We disagree. While a defendant who "possess[es] a firearm or other dangerous weapon . . . in connection with [his] offense" is not eligible for safety-valve relief, the district court never found that Ingram was not qualified for relief on this basis. *See* 18 U.S.C. § 3553(f)(2).

Instead, Ingram's counsel conceded at sentencing that Ingram was ineligible for safety-valve relief based on his failure to provide the necessary information to the government. *See id.* § 3553(f)(5); U.S.S.G. §§ 2D1.1(b)(18), 5C1.2.

Finally, Ingram also appears to argue that the imposition of the firearm enhancement violated his Second Amendment rights under *New York State Rifle & Pistol Assn. v. Bruen*, 597 U.S. 1 (2022), because, prior to his felony convictions, he could lawfully possess the handgun that provided the basis for the enhancement. Ingram did not raise this argument before the district court and cannot now show plain error on appeal. *See Wright*, 607 F.3d at 715. He has not pointed to any precedent from this Court or the Supreme Court establishing that the application of a sentencing enhancement or denial of a safety-valve reduction due to a defendant's possession of a firearm in connection with a drug trafficking crime implicates Second Amendment protections. *Morales*, 987 F.3d at 976.

Accordingly, we conclude that the district court did not commit reversible error in imposing the § 2D1.1(b)(1) enhancement.

## IV. CONCLUSION

For the reasons stated above, we **AFFIRM** Ingram's convictions and sentence.